# Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| EDWARD ALAN YEARTA,<br><br>    Plaintiff,<br><br>v.<br><br>AMUSEMENTS OF AMERICA, INC.; DELTA FAIR, INC.; UNIVERSAL FAIRS, LLC; and BELLE CITY AMUSEMENTS, INC.,<br><br>    Defendants. | Civil Action No.: 2:17-cv-2117 |

### AFFIDAVIT OF KATHY OWENS

I, KATHY OWENS, being first duly sworn, hereby depose and state that:

    1.    My name is Kathy Owens. I am over twenty-one (21) years of age and suffer from no disabilities that would prevent me from making the statements in this affidavit. I make all statements in this affidavit on the basis of my personal knowledge.

    2.    I am a Senior Vice President of London Claims with Crosswalk Claims Management, LLC ("Crosswalk").

    3.    Crosswalk serves as a third-party administrator for Liberty Corporate Capital, Ltd. ("Liberty").

    4.    In its capacity as a third-party administrator, Crosswalk assisted Liberty in handling the claim that gave rise to the above-captioned litigation.

    5.    On October 24, 2018, I attended mediation in the instant litigation on behalf of Liberty, as the insurer of Defendant Delta Fair, Inc. ("Delta Fair") and Amusements of America, Inc. ("AOA").

6. Settlement was reached at mediation, and an agreement was memorialized in a settlement agreement executed on December 6, 2018 (the "Settlement Agreement"). A true and correct copy of the Settlement Agreement is attached to this affidavit as Exhibit A.

7. As a result of the settlement, Liberty, and only Liberty, paid 100 percent of the defense costs of Delta Fair and AOA, and fully funded the $2,075,000 settlement.

8. No other insurer contributed to the $2,075,000 payment.

9. Neither Delta Fair nor AOA contributed to or self-insured any portion of the $2,075,000 payment. To date, neither Delta Fair nor AOA have been asked to contribute to the defense costs in this matter. Liberty has paid and continues to pay all of the defense costs incurred in this action, such that Liberty is the sole party with a right to recover from Belle City Amusements, Inc. and/or its insurer.

10. The Settlement Agreement provided for the creation of an annuity for structured payment of settlement funds to Plaintiff Edward Yearta.

11. Liberty fully funded the annuity for the purpose of settlement payments, and I worked on Liberty's behalf with Prudential Insurance Company of America to establish the annuity pursuant to the Settlement Agreement.

12. Liberty was advised that the annuity required receipt of payment by December 27, 2018. The annuity was fully funded by Liberty on or before December 27, 2018 and was to have been created thereafter.

FURTHER AFFIANT SAYETH NAUGHT:

Executed this 15th day of January, 2019.

By: _____
      Kathy Owens

SWORN TO AND SUBSCRIBED before me this 15th day of January, 2019.

_____
NOTARY PUBLIC
My Commission Expires 07-31-2022

JESSE M. MINELLA
*NOTARY PUBLIC*
MY COMMISSION EXPIRES 07/31/2022

3

# EXHIBIT A

## SETTLEMENT AGREEMENT AND RELEASE

Edward Yearta ("Releasor") hereby executes this Settlement Agreement and Release ("Agreement") in favor of Amusements of America, Inc. ("AofA"), Delta Fair, Inc. ("Delta Fair"), Universal Fairs, LLC ("Universal Fairs"), and Certain Underwriters at Lloyd's, London subscribing to Policy Number MKC00102 ("Underwriters") (AofA, Delta Fair, Universal Fairs, and Underwriters are collectively the "Releasees"). Releasor and Releasees may sometimes be referred to collectively as the "Parties."

WHEREAS, on or about August 30, 2016, Releasor suffered injuries when he was electrocuted during the set-up for the 2016 Delta Fair and Music Festival (the "Fair");

WHEREAS, Belle City Amusements, Inc. ("Belle City") provided an electrical generator for the Fair and authorized Releasor, Releasor's employer, and AofA to use the generator, specifically indicating that the generator was ready to use. With this authorization, rides owned by Releasor's employer and AofA were connected to the generator. The Belle City generator was not properly grounded, and electrical current flowed through an AofA operated ride and the improperly grounded Belle City generator before electrocuting the Releasor (the "Incident");

WHEREAS, Releasor has suffered permanent and disabling injuries. To date, he has not returned to work, and may never do so. As a result of his injuries, Releasor has had numerous operations and continues to treat for his injuries;

WHEREAS, Delta Fair contracted with AofA for AofA to provide certain amusements at the Fair, and Belle City entered into a contract with AofA (the "Subcontract"). The Subcontract required Belle City to defend, indemnify, and hold AofA and Delta Fair harmless for the Incident and carry $2 million in primary liability insurance coverage. Belle City refused to defend, indemnify, and hold AofA and Delta Fair harmless, and only obtained and provided confirmation of $1 million in insurance coverage (a "Breach of the Subcontract");

WHEREAS, the Subcontract also required Belle City to obtain primary insurance coverage naming AofA and Delta Fair as additional insureds. Belle City purchased an insurance policy from Ace American Insurance Company ("Ace"), under which AofA and Delta Fair were additional insureds for the Incident. Nonetheless, Ace refused to defend or indemnify AofA and Delta Fair (a "Breach of the Ace Policy Provisions");

WHEREAS, Releasor filed suit (and later amended the suit to add Belle City) to allege claims against AofA, Delta Fair, Universal Fairs, and Belle City: *Yearta v. Amusements of America, Inc., et al.*, in the United States District Court for the Western District of Tennessee, Western Division, Case No. 2:17-cv-02117 (the "Lawsuit");

WHEREAS, in the Lawsuit, Releasor sought economic and non-economic damages, and Releasor was prepared to challenge the constitutionality of limits on non-economic damages, potentially exposing AofA, Delta Fair, and Belle City to damages in excess of their separately procured insurance policy limits for their exclusive protection. Regardless of any limits on non-economic damages, Releasor's claim in the Lawsuit was well in excess of the previously confirmed and inadequate limits of the Ace Policy;

1

WHEREAS, the parties participated in a mediation on October 24, 2018. Ace did not attend the mediation in person due to a purported conflict, and instead, Ace appeared telephonically through a third-party administrator. Ace refused to meaningfully participate in the mediation. Instead, Ace conditioned its participation in the settlement on obtaining releases, for its benefit only, for the Breach(es) of the Subcontract and Breach(es) of the Ace Policy Provisions;

WHEREAS, Releasor would not agree to settle the case piecemeal, by releasing some defendants in the Lawsuit while leaving others in the case. The settlement is the lowest amount that Releasor would have accepted, and if it was not offered at mediation, Releasor would not have settled at or below that amount;

WHEREAS, Underwriters, as the insurer of AofA and Delta Fair, agreed to negotiate in good faith, despite Ace's refusal to meaningfully participate, and agreed to settle the Lawsuit to protect the interests of AofA and minimize its damages. In exchange for Underwriters' good faith participation, Releasor also agreed to the settlement and release of Belle City and Universal Fairs, and no additional monetary consideration has been paid for the release of Belle City and Universal Fairs;

WHEREAS, the Parties are desirous of resolving any and all claims and causes of action, known or unknown, which have arisen or could arise out of the facts and circumstances in connection with the Incident, the Lawsuit, and/or the surrounding circumstances; and

WHEREAS, as a result of negotiations, an Agreement has been reached;

ACCORDINGLY, the Parties agree as follows:

1. Notwithstanding anything herein to the contrary, the Parties recognize that AofA, Delta Fair, and/or Underwriters are seeking to enforce the Subcontract and the Ace Policy, and thus, nothing herein does or is intended to limit or restrict the ability of AofA, Delta Fair, and/or Underwriters to pursue any and all claims for the Breach of the Subcontract and Breach of the Ace Policy. All such claims are reserved. Releasor understands AofA, Delta Fair, and/or Underwriters will pursue any and all claims for the Breach of the Subcontract and Breach of the Ace Policy. The WHEREAS clauses are not merely recital and are expressly incorporated in the terms of this Agreement.

2. Underwriters shall pay Releasor a total of TWO MILLION SEVENTY-FIVE THOUSAND DOLLARS ($2,075,000.00) (the "Payment") in exchange for a full, complete, general, and final release of all claims against Releasees and Belle City. Upon issuance of the Payment, Releasees shall have no continuing and/or ongoing obligation to Releasor and/or Releasor's attorneys. Notwithstanding any subsections herein to the contrary, no promise has been made by Releasees to Releasor to pay any further or other consideration for this Agreement. Payment is due the later of 45 days from October 24, 2018 or as required for the structured payment components of this settlement, whichever is later. In consideration of the release set forth below, the Payment shall be paid as outlined below:

A check in the amount of ONE MILLION ONE HUNDRED SEVENTY-FIVE THOUSAND DOLLARS ($1,175,000.00) payable to "Edward Yearta and his attorney, Kinnard, Clayton & Beveridge".

A check in the amount of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) made payable to "Prudential Assigned Settlement Services Corporation (PASSCorp)" to fund the periodic payments listed below in section 2.1.

A check in the amount of FOUR HUNDRED THOUSAND DOLLARS ($400,000.00) made payable to "Pacific Life & Annuity Services, Inc." by Insurer to fund the periodic payments listed below in section 2.2.

2.1   Periodic payments made to Edward Yearta ("Payee") made according to the Schedule of Payments as follows (the "Periodic Payments"):

Commencing on 02/01/2019, $1,000.00 payable monthly, guaranteed for 30 years, with the last guaranteed payment on 01/01/2049.

Commencing on 02/15/2019, $1,000.00 payable monthly, guaranteed for 30 years, with the last guaranteed payment on 01/15/2049.

$43,009.83 guaranteed lump sum payment on 09/20/2025.
$50,000.00 guaranteed lump sum payment on 07/24/2036.

2.2   Periodic payments made to Randall L. Kinnard ("Payee") made according to the Schedule of Payments as follows (the "Periodic Payments"):

Commencing on 01/15/2026, $41,793.00 payable monthly, guaranteed for 1 year, with the last guaranteed payment on 12/15/2026.

*The Plaintiff (Releasor) authorizes and instructs payment to be made to his attorney as provided herein. Such amount shall be paid from periodic payments that otherwise would be payable to the Plaintiff pursuant to this agreement. The Plaintiff acknowledges and agrees that these payment instructions are solely for the Plaintiff's convenience and do not provide the Plaintiff's attorney with any ownership interest in any portion of the annuity or the settlement other than the right to receive the fee payments from the Plaintiff in the future as more specifically set forth herein.*

All the payments set forth herein constitute damages on account of personal physical injuries, arising from an occurrence within the meaning of Section 104(a)(2) of the IRS Code of 1986, as amended.

2.3   Qualified Assignment. The parties hereto acknowledge and agree that the Defendant and/or their Insurer may make a qualified assignment within the meaning of Section 130(c) of the Internal Revenue Code of 1986, as amended, of the Defendant's and/or their

3

Insurer's liability to make the periodic payments required herein. Any such assignment, if made, shall be accepted by the Plaintiff without right of rejection and shall completely release and discharge the Defendants and/or their Insurer from such obligation hereunder as are assigned in section 2.1 to **Prudential Assigned Settlement Services Corporation** and in section 2.2 to **Pacific Life & Annuity Services, Inc.** (the "Assignees"). The Plaintiff recognizes that, in the event of such an assignment, the respective Assignee shall be their sole obligor with respect to the obligations assigned, and that all other releases that pertain to the liability of the Defendant and/or their Insurer shall thereupon become final, irrevocable and absolute.

If the liability to make the periodic payments is assigned by way of a Qualified Assignment, the Assignee's obligation for payment of the periodic payments is no greater than the obligation of the person originally liable (whether by suit or agreement) for payment and from whom the obligation was assigned.

2.4 Plaintiff's Rights to Payments. Said payments cannot be accelerated, deferred, increased or decreased by the Plaintiff or any Payee, nor shall the Plaintiff or any Payee have the power to sell or mortgage or encumber same, or any part thereof, nor anticipate the same, or any part hereof, by assignment or otherwise.

2.5 Right to Purchase an Annuity. The Assignee in section 2.1 reserves the right to fund its liability to make periodic payments through the purchase of an annuity policy from **The Prudential Insurance Company of America** and the Assignee in section 2.2 reserves the right to fund its liability to make periodic payments through the purchase of an annuity policy from **Pacific Life Insurance Company** (the "Annuity Issuers"). The respective Assignee shall be the owner of the respective Annuity policy and shall have all the rights of ownership. The Assignee may have their respective Annuity Issuer mail payments directly to the Payee. The Payee shall be responsible for maintaining the currency of the proper mailing address and mortality information to the Annuity Issuer.

2.6 Payee's Beneficiary. Any payments in section 2.1 to be made after the death of the Payee pursuant to the terms of this Settlement Agreement and Release shall be made to such person or entity as shall be designated in writing by the said Payee to the Assignee. If no such person or entity is so designated by said Payee, such payments shall be made to the Estate of the Payee. No such designation, nor any revocation thereof, shall be effective unless it is in writing and delivered to the Assignee. The designation must be in a form acceptable to the Assignee, but in no event shall the request of the Payee be unreasonably withheld or denied.

Any payments in section 2.2 to be made after the death of the Payee pursuant to the terms of this Settlement Agreement and Release shall be made to Peggy S. Kinnard, if living, otherwise to the Estate of the Payee. The Payee may submit a request to change the beneficiary to the Assignee. No such designation, nor any revocation thereof, shall be effective unless it is in writing and delivered to the Assignee. The designation must be in a form acceptable to the Assignee, but in no event shall the request of the Payee be unreasonably withheld or denied.

2.7. <u>Discharge of Obligation.</u> The obligation of the Assignee to make each Periodic Payment shall be fully discharged upon the mailing of a valid check or electronic funds transfer in the amount of such payment on or before the due date to the last address on record for the Payee with the Annuity Issuer. If the Payee notifies the Assignee that any check or electronic funds transfer was not received, the Assignee shall direct the Annuity Issuer to initiate a stop payment action and, upon confirmation that such check was not previously negotiated or electronic funds transfer deposited, shall have the Annuity Issuer process a replacement payment.

3. In consideration of the Payment, Releasor and his agents, attorneys, heirs, executors, assigns, children, kin, administrators, and successors release and forever discharge Releasees, their agents, servants, employees, officers, insurers, reinsurers, attorneys, independent contractors, successors, predecessors in interest, assigns, franchisors, and all related entities, adjusters, anyone claiming by, through or under such persons, and Belle City, from any and all legal actions, claims, demands, rights, actions, causes of actions, and damages known or unknown, anticipated or unanticipated, which the Releasor has now or claims to have now or which may hereafter accrue against Releasees arising, evolving, growing out of, or in any way related to the events underlying the Fair, the Incident and/or the Lawsuit, including, but not limited to property damages, damages for physical injuries (including alleged permanent physical injury and disability), past, present and future medical bills, pain and suffering, emotional and/or mental distress, lost earning capacity, lost wages, punitive damages, interest, attorneys' fees, economic and non-economic damages, and conduct during litigation. For the avoidance of doubt, AofA, Delta Fair, and Underwriters are not releasing any claims that they may have against Ace and/or Belle City.

4. Releasor acknowledges that the consideration supporting this Agreement fully and completely satisfies all claims, demands, rights, actions, causes of actions of any kind and damages known and unknown, anticipated or unanticipated, which Releasor now has or claims to have or which may hereafter accrue against Releasees in any way related to the events underlying the Fair, the Incident, and/or the Lawsuit. This Agreement specifically includes, without limitation, all known and unknown claims of bodily injury, disability, lost income, medical and drug expenses, past, present, and future mental and physical pain and suffering, disruption of normal life and diminution in the enjoyment of life, intangible damages, property damage, any future wrongful death claim of Releasor's representatives or heirs, and all other claims and damages of every kind arising now or may in the future develop as to Releasees.

5. Releasor warrants that he is the only party of interest with regard to the events that arose or may arise out of the Fair, the Incident, and/or the Lawsuit, and that he has not assigned or otherwise transferred or attempted to transfer, either separately or collectively, any of his claims, demands, rights, actions or causes of action released in this Agreement. Releasor agrees that he will not assign, transfer, or attempt to transfer any of his claims, demands, rights, actions or causes of action released in this Agreement.

6. Releasor expressly releases Releasees from any and all obligations to pay any medical expenses, lost wages benefits or other expenses incurred by Releasor or on his behalf, past or future. The Releasor warrants and represents that all Medicare, workers compensation, or other

health care providers who have or may have any valid, legal, and enforceable liens, as a result of the care and treatment provided, have been notified of this settlement, and that all such valid, legal and enforceable claims or liens have or will be satisfied from the sums received and set forth herein.

7. Releasor agrees to indemnify and hold harmless Releasees against all valid and enforceable liens, rights of reimbursement, and subrogation rights.

8. Any and all valid and enforceable liens, rights of reimbursement, and subrogation rights shall be satisfied or otherwise resolved by Releasor out of the settlement proceeds of this Agreement. Upon request, Releasor will furnish evidence of the extinguishment of the liens within seven (7) days, once extinguished.

9. Releasor acknowledges that any decision regarding entitlement to Social Security benefits or Medicare or Medicaid benefits, including the amount and duration of payments and offset reimbursement for prior payments is exclusively within the jurisdiction of the Social Security Administration, the United States Government, and the courts, and is determined by law and regulations. As such, the United States Government is not bound by any of the terms of this Agreement. To the extent the information will be used for reporting to the United States Government, Releasor agrees to provide personal information upon request by Releasees.

10. The Parties have attempted to resolve this matter in compliance with both state and federal law, and believe that the settlement terms adequately consider Medicare and Medicaid's interest and do not reflect any attempt to shift responsibility for payment of medical expenses covered under this settlement to Medicare or Medicaid pursuant to 42 U.S.C. § 1395y(b). The Parties acknowledge and understand that any present or future action or decision by the Center for Medicaid and Medicare Services ("CMS") or Medicaid, including actions regarding the Releasor's eligibility or entitlement to receive Medicaid or Medicaid payments, will not render this release void or ineffective, or in any way affect the finality of this settlement.

11. The Parties agree to cooperate and to take all additional actions necessary to effect the intent of this Agreement, that: Releasees shall be released from all claims described and released in this Agreement, Releasees may pursue recovery from Ace and/or Belle City, and Belle City is released herein to prevent erosion of indemnity coverage limits under the Ace Policy.

12. Releasor agrees to dismiss with prejudice all of its claims in the Lawsuit and jointly move to dismiss without prejudice AofA and Delta Fair's claims against Belle City.

13. Each party shall bear its own attorneys' fees and costs associated with the litigation arising out of the Fair, the Incident, the Lawsuit, and this Agreement.

14. The Parties acknowledge that this Agreement constitutes the entire agreement between them in respect to the Incident and Lawsuit described herein, and that in entering this Agreement, the Parties have not relied upon any representation or statement not set forth herein, and that the representations contained in this Agreement are the complete and full representations to which they have agreed.

15. An executed copy or facsimile or electronically stored copy of this Agreement shall have the same legal force and effect as the original.

16. No amendments or modifications of the terms or provisions of this Agreement shall be valid unless made in writing and signed by all Parties.

17. The provisions of this Agreement are severable, and if any part of it is found to be unenforceable, the other paragraphs, or parts thereof, shall remain full, valid and enforceable. This Agreement shall survive termination of any arrangements contained herein.

18. This Agreement shall in all events be construed as a whole, according to its fair meaning, and not strictly for or against a party merely because that party (or the party's legal representative) drafted the Agreement. For all purposes, the Agreement will be considered to have been drafted equally by all Parties. Any headings, titles, or captions contained in this Agreement are merely for reference and do not define, limit, extend, or describe the scope of this Agreement or any provision herein. Unless the context requires otherwise, (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine, and neuter, and (b) the word "including" means "including, without limitation."

19. Having had the opportunity to confer with his counsel, Releasor hereby declares that the terms of this Agreement have been completely read, fully understood and voluntarily accepted for the purposes of making a full and final compromise in settlement and release of any and all claims, disputed or otherwise, on account of the alleged injuries and damages mentioned above as the subject of the Fair, the Incident and/or the Lawsuit and/or arising out of or relating in any way to the Fair, the Incident and/or the Lawsuit.

20. This Agreement shall be governed by and interpreted under Tennessee law.

IN WITNESS WHEREOF, **EDWARD YEARTA** has hereunto set his hand and affixed his seal this 6th day of December 2018.

_____
Edward Yearta

**STATE OF GEORGIA**
**COUNTY OF** Lanier

I, Christy North a Notary Public in and for said County in the State of Georgia, DO HEREBY CERTIFY that Edward Yearta, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal. This 6th day of December 2018.

_____
Notary Public
(AFFIX SEAL)

7